## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **DALE EDWARD BLEVINS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:13cv00038 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **CAROLYN W. COLVIN,**[1] | ) | |
| **Acting Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### I.  Background and Standard of Review

Plaintiff, Dale Edward Blevins, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Federal Rules of Civil Procedure Rule 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Blevins protectively filed his application for SSI on February 16, 2010, alleging disability as of February 16, 2010, due to depression, diminished mental capacity, arthritis, heart disease, dizzy spells, shortness of breath, post concussion syndrome and trouble interacting with people. (Record, ("R."), at 173-79, 184, 188.) The claims were denied initially and on reconsideration. (R. at 90-92, 97, 100-02, 104-06.) Blevins then requested a hearing before an administrative law judge, ("ALJ"). (R. at 107-08.) The hearing was held on December 5, 2011, at which Blevins was represented by counsel. (R. at 37-67.)

By decision dated February 7, 2012, the ALJ denied Blevins's claim. (R. at 22-32.) The ALJ found that Blevins had not engaged in substantial gainful activity since March 2, 2010, the date of his application. (R. at 24.) The ALJ determined that the medical evidence established that Blevins suffered from severe impairments, including ischemic heart disease, chronic heart failure, osteoarthritis and allied disorders, cerebral trauma, intracranial injury, an affective disorder, borderline intellectual functioning, alcohol dependence, sustained, in full remission and post-traumatic stress disorder, ("PTSD"), but he found that Blevins did not

have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24-25.) The ALJ found that Blevins had the residual functional capacity to perform light work[2] that did not require climbing ladders, ropes or scaffolds and that did not require working around unprotected heights or dangerous equipment or products. (R. at 26.) The ALJ further found that Blevins could occasionally crouch, crawl and climb ramps and stairs and that he had moderate limitations in his ability to work with supervisors, to accept instructions and criticism, to work with co-workers without distractions or exhibiting behavioral extremes, to work with the public, to maintain attention and concentration for extended periods, to work at a production rate pace, to maintain attendance, to be punctual and take usual breaks, to respond appropriately to work pressures and to understand, remember and carry out detailed and complex instructions. (R. at 26.) Thus, the ALJ found that Blevins was unable to perform his past relevant work. (R. at 31.) Based on Blevins's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Blevins could perform other jobs existing in significant numbers in the national economy, including jobs as an assembler, a packer, an inspector, a sorter and a grader. (R. at 31-32.) Therefore, the ALJ found that Blevins was not under a disability as defined under the Act and was not eligible for benefits. (R. at 32.) *See* 20 C.F.R. § 416.920(g) (2013).

After the ALJ issued his decision, Blevins pursued his administrative appeals, (R. at 17), but the Appeals Council denied his request for review. (R. at 4-7.) Blevins then filed this action seeking review of the ALJ's unfavorable decision,

---

[2] Light work involves lifting items weighing up to 20 pounds occasionally and up to 10 pounds frequently. If an individual can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 416.927(b) (2013).

which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2013). The case is before this court on the Commissioner's motion for summary judgment[3] filed November 20, 2013.

## *II. Facts*

Blevins was born in 1961, (R. at 173), which classifies him as a "person closely approaching advanced age" under 20 C.F.R. § 416.963(d).[4] Blevins obtained his general equivalency development, ("GED"), diploma and has vocational training as a diesel mechanic. (R. at 45, 189.) Blevins last worked full-time in 1996 as an auto body repairman. (R. at 45.) Blevins testified at his hearing that he had the most difficulty with arthritis in his hands and back problems. (R. at 49.) He stated that he had constant back pain, which was tolerable and that he could function with for the most part. (R. at 49.) He stated that he had stiffness in his hands, which prevented him from using his hands to turn bolts and wrenches. (R. at 50.)

When asked how well he got along with authority figures, Blevins stated, "[t]hey are people hate them all." (R. at 208.) He stated that he had been fired or laid off from a job because he would "go off loose [sic] control." (R. at 208.) He stated that he feared the government, people, himself, the police, the Internal Revenue Service and God. (R. at 208.) Blevins stated that he feared being around

---

[3] Blevins did not file a motion for summary judgment in this matter. He did, however, file a brief, (Docket Item No. 12), ("Plaintiff's Brief").

[4] At the time Blevins filed his application for benefits, he was classified as a "younger person" under 20 C.F.R. § 416.963(c). However, by the date of the ALJ's decision, Blevins had reached 50 years of age making him "a person closely approaching advanced age."

people, trying to live, getting too old to fight and defend himself, paperwork and receiving mail. (R. at 208.) He stated that he hated most of his family and most people in general. (R. at 209.)

John Newman, a vocational expert, also was present and testified at Blevins's hearing. (R. at 63-66.) He classified Blevins's past work as an auto body repairer[5] as heavy[6] and skilled. (R. at 63.) Newman was asked to consider an individual of Blevins's age, education and work experience, who had the residual functional capacity to perform light work that did not require him to climb ladders, ropes and scaffolds, that allowed for only occasional postural limitations, that did not expose him to unprotected heights or dangerous equipment and products, that allowed for moderate limitations in his ability to work with supervisors, to accept instructions and criticism, to work with co-workers without distractions or behavioral extremes, to work with the public, to maintain attention and concentration for extended periods, to understand, remember and carry out detailed and complex instructions, to work at a fixed production rate, to maintain attendance, punctuality and the usual breaks and to respond appropriately to work pressure. (R. at 64.) Newman stated that there were a significant number of jobs that existed that such an individual could perform, including jobs as an assembler, a packer, an inspector, a tester and a sorter. (R. at 64.) Newman was asked to consider the same individual, but who had mild limitations in his abilities to work

---

[5] Newman stated that the Dictionary of Occupational Titles, ("DOT"), classified the job of auto body repairer as medium; however, based on the work that he reviewed and the people that he talked to, he believed that the job was actually classified as heavy. (R. at 63.)

[6] Heavy work is defined as work that involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, he also can do sedentary, light and medium work. *See* 20 C.F.R. § 416.967(d) (2013).

with supervisors, to accept instructions and criticism, to work with co-workers without distractions or behavioral extremes, to work with the public, to maintain attention and concentration for extended periods, to understand, remember and carry out detailed and complex instructions, to work at a fixed production rate, to maintain attendance, punctuality and usual breaks and to respond appropriately to work pressure, and who also would have mild limitations in exposure to hazards and would have to recline about two-thirds of the workday. (R. at 65.) Newman stated that all jobs would be eliminated. (R. at 65.) He also stated that, if the individual's ability to stay on task was such that he would be off task for more than 25 percent of a normal workday, there would be no jobs available. (R. at 65.) Newman also testified that all competitive employment would be precluded if the individual regularly missed more than two days of work per month. (R. at 65-66.) He further stated that if the individual could only occasionally use his hands and upper extremities, the jobs previously mentioned would be eliminated. (R. at 66.)

In rendering his decision, the ALJ reviewed records from Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Richard J. Milan, Jr., Ph.D., a state agency psychologist; Dr. Bert Spetzler, M.D., a state agency physician; Mountain Home Veterans Affairs Medical Center; Keith Kessler, L.C.S.W., a licensed clinical social worker; and Wade Smith, M.S., a licensed senior psychological examiner.

Blevins was treated at Mountain Home Veterans Affairs Medical Center, ("VA Center"), for various ailments, including chronic ischemic heart disease, depressive disorder, not otherwise specified, tobacco use disorder, hypertension, obesity, hyperlipidemia and unspecified chest pain. (R. at 252-452.) On August 27,

2009, Blevins was diagnosed with a single episode of major depressive disorder. (R. at 261.) On September 2, 2009, Blevins was admitted for complaints of chest, shoulder and neck pain. (R. at 266-68.) It was noted that Blevins was not compliant with medication stating that "they don't work." (R. at 267.) Blevins's pain subsided, and his blood pressure was controlled after his blood pressure medications were reinstated. (R. at 268.) A chest x-ray and electrocardiogram were normal. (R. at 268, 370.) On September 10, 2009, Blevins was diagnosed with a delusional disorder and PTSD. (R. at 260.) On September 11, 2009, Blevins was diagnosed with recurrent, severe major depressive disorder, without mention of psychotic behavior. (R. at 260.) Blevins's then-current Global Assessment of Functioning score,[7] ("GAF"), was assessed at 25.[8] (R. at 263.) On September 21, 2009, Blevins's then-current GAF score was assessed at 45.[9] (R. at 263.) On November 9, 2009, a myocardial perfusion study showed a small to moderate-sized area of ischemia in the distal anteroseptal and apex area of the heart. (R. at 345-46.) On October 28, 2009, Blevins was diagnosed with osteoarthritis. (R. at 257.) On November 3, 2009, Blevins's then-current GAF score was assessed at 55.[10] (R. at 263.) On December 10, 2009, Blevins underwent a left heart catheterization,

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8] A GAF score of 21-30 indicates that the individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment … OR inability to function in almost all areas…." DSM-IV at 32.

[9] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

[10] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning…." DSM-IV at 32.

with placement of a stent in the left anterior descending artery. (R. at 255, 265-66, 330.) The study showed a single vessel coronary artery disease with critical lesion in the proximal part of the mid left anterior descending coronary artery segment, normal left ventricle systolic function and mildly elevated left ventricle end diastolic pressure. (R. at 331-32.) Blevins reported that he lived in a two-story home with 14 steps to the second level. (R. at 301, 416.) He stated that his bedroom was on the second level, but he had no problems with the steps. (R. at 301, 416.) He reported that he was independent with activities of daily living and driving. (R. at 301, 416.) He was discharged in stable condition. (R. at 266.)

On January 4, 2010, Blevins reported mild anxiety and depression. (R. at 291, 405.) He reported continued reccuring nightmares of fighting. (R. at 291, 405.) Blevins was alert and oriented with a dysthymic mood. (R. at 292, 406.) It was noted that his gait was steady with a normal rate of movement. (R. at 292, 406.) His thought process was logical and goal directed, and he denied auditory or visual hallucinations or delusional thinking. (R. at 292, 406.) Blevins's recent memory was impaired, his cognitive function and judgment were intact, and his insight was good. (R. at 292, 406.) Blevins's then-current GAF score was assessed at 55. (R. at 263, 292, 407.)

On January 14, 2010, Blevins was seen for follow-up concerning his complaints of chest pain. (R. at 288, 402.) He reported that he was doing well, he denied any chest pain, shortness of breath or palpitations and stated that he was back to performing his regular activities. (R. at 288, 402.) On January 21, 2010, Blevins denied any chest pain. (R. at 285, 399.) Blevins reported that he experienced dreams about helplessness and fighting someone, which were similar

to the situation when he was beat up on an Army base. (R. at 285, 399.) He was diagnosed with depression and questionable PTSD. (R. at 286, 400.)

On February 11, 2010, Blevins was seen at the emergency room for complaints of dizziness and intermittent confusion. (R. at 276-77, 389-96.) He reported that he had been beat on the head by the butt of a rifle brandished by his niece on January 27, 2010. (R. at 276, 390.) Blevins stated that he did not sustain loss of consciousness, but required suturing of the scalp. (R. at 276, 390.) Blevins had difficulty processing information and with short-term memory and concentration. (R. at 277, 391.) His speech was slow, but clear. (R. at 277, 391.) He had normal gait and good heel and toe walk. (R. at 277, 391.) A CT scan of Blevins's brain showed no acute intracranial abnormality. (R. at 277, 343-44, 391.) Chest x-rays were normal. (R. at 344-45.) He was diagnosed with post concussion syndrome. (R. at 277.) Blevins was instructed to "work on short things" that would stimulate his mind, to engage in light physical exercise and not to drive. (R. at 277-78.) On March 9, 2010, Blevins requested that he be released to drive. (R. at 269-70, 383-85.) He reported no further episodes of dizziness. (R. at 269, 383.) Blevins was diagnosed with depression/possible adverse reaction to a vaccination received while in the Army, post concussion syndrome, resolved, coronary artery disease, stable, hyperlipidemia and tobacco use. (R. at 270, 384.) On April 20, 2010, Blevins reported that he had stopped taking the medication sertraline because he believed it caused anger problems. (R. at 380.) Blevins stated that some days he just "goes off" and becomes really violent. (R. at 381.) It was noted that Blevins was very interested in obtaining help with anger management without the use of medication. (R. at 381.)

On June 3, 2010, Blevins had no complaints. (R. at 370.) He reported that he self-discontinued sertraline, stating that it did not help. (R. at 372.) Blevins was alert and oriented. (R. at 373.) His mood was dysthymic and affect blunted. (R. at 373.) He had a steady gait and slow rate of movement. (R. at 373.) Blevins's thought process and content were logical. (R. at 373.) Blevins's recent memory was impaired. (R. at 374.) His cognitive function and judgment were intact, and his insight was fair. (R. at 374.) It was reported that Blevins had a low IQ. (R. at 374.) It was noted that Blevins's coronary artery disease was stable, and Blevins reported that he had started to walk for exercise daily. (R. at 371.) Blevins was diagnosed with depressive disorder, not otherwise specified, and his then-current GAF score was assessed at 45. (R. at 374.)

On February 23, 2011, Blevins reported that he was very depressed. (R. at 517.) It was noted that Blevins's depression showed some improvement and that he was satisfactorily responding to treatment. (R. at 518.) On April 26, 2011, Blevins underwent a psychiatric evaluation at the VA Center. (R. at 505-10.) Blevins reported that he had been assaulted while stationed in Germany and that he had an adverse reaction to a series of vaccinations while in the Army. (R. at 505-06.) Blevins reported that he was depressed most of the time and preferred to be by himself. (R. at 507.) Blevins reported working only part-time because he could not handle much stress and because he had trouble concentrating on his work. (R. at 508.) It was reported that Blevins's mood was depressed and anxious. (R. at 509.) On May 4, 2011, Blevins was seen at the emergency room at the VA Center for low back pain. (R. at 493-95.) He denied leg weakness and numbness. (R. at 494.) Blevins's gait was slow, and he had adequate range of motion in both the upper and lower extremities. (R. at 495.) X-rays of Blevins's lumbar spine showed mild

disc space narrowing at the L4-L5 and L5-S1 levels; small anterior osteophytes at the L4-L5 level and smaller osteophytes at the L1-L5 levels; disc space narrowing at the L1-L2 level with small Schmorl's node; and early osteoarthritic changes at the posterior facets of the L5-S1 level. (R. at 458.) X-rays of Blevins's pelvis/hips were normal. (R. at 459.) On July 7, 2011, Blevins reported that he was doing well. (R. at 489.) He denied chest pain, shortness of breath and palpitations. (R. at 489.) He stated that he was back to his regular activities and that he was "pretty much active." (R. at 489.) On July 30, 2011, Blevins was seen at the emergency room after a small metal fragment became lodged in his left eye while he was working on a car. (R. at 465-66.) On August 30, 2011, it was noted that Blevins's coronary artery disease was stable. (R. at 473.) On September 13, 2011, Blevins reported that he had been compliant with his medication regimen and that he was tolerating the medications well. (R. at 537.) His then-current psychosocial stressors included trying to obtain custody of his wife's sister's child and a recent breach of confidentiality.[11] (R. at 537.) Blevins's recent memory was impaired, his cognitive function and judgment were intact, and his insight was good. (R. at 538.) He was diagnosed with PTSD and depressive disorder, not otherwise specified. (R. at 538.) His then-current GAF score was 55. (R. at 539.)

On October 1, 2011, Blevins contacted the suicide hotline, stating that he had been having homicidal thoughts toward lawyers in a custody case that he was involved in. (R. at 534-35.) He stated that his medical records were released illegally, and he was humiliated. (R. at 535.) On October 3, 2011, a follow-up

---

[11] Blevins reported that the Department of Social Services required him to complete a full psychiatric evaluation related to his attempt to gain custody of his nephew. (R. at 537.) Documentation of the psychiatric evaluation was sent to Social Services and to all of Blevins's family members. (R. at 537.) Blevins expressed anger over the situation and reported worsening depression and anxiety since his records were mailed to family members. (R. at 537.)

telephone call was made to Blevins. (R. at 535.) Blevins stated that he was frustrated, but he was not endorsing any suicidal or homicidal thoughts. (R. at 535.) On October 20, 2011, Blevins complained of low back pain. (R. at 529.) He reported that he had been sitting at a computer "a lot" and had changed the brake pads on an automobile the previous day. (R. at 529.) Blevins had normal motor strength in all extremities, no sensory deficit, reflexes symmetrical bilaterally, and no abnormal movements were noted. (R. at 531.) He had some tension and spasm in his back, and straight leg raising tests were positive on the right. (R. at 531.) An x-ray of Blevins's lumbosacral spine was taken and compared with a previous x-ray dated May 4, 2011. (R. at 523.) The x-ray showed mild levoscoliosis, which had increased since previous study; decreased lordotic curvature lateral view; mild disc space narrowing at the L1-L2, L4-L5 and L5-S1 levels; small Schmorl's node at the L1-L2 disc space; small anterior osteophytes at the L1-L2, L2-L3 and L3-L4 levels and especially at the L4-L5 level; and early osteoarthritic changes in the posterior facets at the L5-S1 level. (R. at 523.) He was diagnosed with low back pain with bilateral radiculopathy. (R. at 531.)

On June 24, 2013, Blevins was in no acute distress, and he had normal muscle strength, bulk and tone. (Plaintiff's Brief, Ex. 3, Pt. 3 at 8.) No gross, sensory or motor deficits were noted, and he had a stable gait. (Plaintiff's Brief, Ex. 3, Pt. 3 at 8.) His judgment and insight were good, his recent and remote memory was intact, and he had a normal mood and affect. (Plaintiff's Brief, Ex. 3, Pt. 3 at 8.) On July 22, 2013, Blevins reported that he was having a "good day mentally." (Plaintiff's Brief, Ex. 2, Pt. 2 at 21.) His mood was less depressed and his affect flat. (Plaintiff's Brief, Ex. 2, Pt. 2 at 21.) Blevins reported that he was suspicious, especially towards those in authority. (Plaintiff's Brief, Ex. 2, Pt. 2 at

22.) On July 31, 2013, Blevins complained of low back pain, depression and anger issues. (Plaintiff's Brief, Ex. 2, Pt. 2 at 15.) Blevins stated that his lower lumbar pain radiated into his calf and that he had numbness and tingling into the bottom of his foot. (Plaintiff's Brief, Ex. 2, Pt. 2 at 15.) He denied shortness of breath, chest pain and palpitations. (Plaintiff's Brief, Ex. 2, Pt. 2 at 15.) Blevins had normal range of motion, no edema, no deformities and no cyanosis. (Plaintiff's Brief, Ex. 2, Pt. 2 at 17.) His motor strength was normal in all four extremities, there were no sensory deficits, reflexes were symmetrical bilaterally, and no abnormal movements were noted. (Plaintiff's Brief, Ex. 2, Pt. 2 at 17.) Blevins reported being angry because of his recent disability rejection. (Plaintiff's Brief, Ex. 2, Pt. 2 at 3.) He reported occasional crying spells, decreased energy level and irritability. (Plaintiff's Brief, Ex. 2, Pt. 2 at 3.) It was noted that Blevins's mood was depressed, and he had a flat affect. (Plaintiff's Brief, Ex. 2, Pt. 2 at 6.) His judgment and insight were adequate. (Plaintiff's Brief, Ex. 2, Pt. 2 at 6.) He was diagnosed with depressive disorder, not otherwise specified, and PTSD. (Plaintiff's Brief, Ex. 2, Pt. 2 at 8.) His then-current GAF score was assessed at 48. (Plaintiff's Brief, Ex. 2, Pt. 2 at 8.)

On August 6, 2013, Blevins presented to the emergency room at the VA Center for complaints of worsening low back pain that radiated down his right leg, worsening depression and anger issues. (Plaintiff's Brief, Ex. 1, Pt. 1 at 27.) Pain was noted bilaterally with straight leg raising tests at 20 degrees. (Plaintiff's Brief, Ex. 1, Pt. 1 at 27.) He was diagnosed with lumbar radiculopathy and PTSD. (Plaintiff's Brief, Ex. 1, Pt. 1 at 27-28.) On August 8, 2013, Blevins reported that he was doing well. (Plaintiff's Brief, Ex. 1, Pt. 1 at 19.) He denied chest pain and shortness of breath. (Plaintiff's Brief, Ex. 1, Pt. 1 at 19.) He was in no acute

distress. (Plaintiff's Brief, Ex. 1, Pt. 1 at 19.) On August 13, 2013, Blevins was very tearful and despondent after learning about the Army's investigation of his allegations against his commanding sergeant. (Plaintiff's Brief, Ex. 1, Pt. 1 at 15-16.) His mood was depressed and his affect was angry. (Plaintiff's Brief, Ex. 1, Pt. 1 at 17.) It was noted that Blevins was "quite angry" over how he had been treated during his life, which tended to color his perception of others, particularly those in government authority positions. (Plaintiff's Brief, Ex. 1, Pt. 1 at 17.) It was reported that Blevins was "very depressed." (Plaintiff's Brief, Ex. 1, Pt. 1 at 17.) On August 21, 2013, Blevins reported that he was feeling better. (Plaintiff's Brief, Ex. 1, Pt. 1 at 13.) His mood was depressed and affect was somewhat flat. (Plaintiff's Brief, Ex. 1, Pt. 1 at 14.) While Blevins was still "quite depressed," it was noted that he had calmed down since his previous visit. (Plaintiff's Brief, Ex. 1, Pt. 1 at 14.)

On September 4, 2013, Keith Kessler, L.C.S.W., a licensed clinical social worker at the VA Center, reported that, from his personal experience and review of the medical records, Blevins's mental problems existed prior to January 2010. (Plaintiff's Brief, Ex. 1, Pt. 1 at 1.) Kessler noted that Blevins's report was believable, in that he suffered a loss of cognitive functioning and speech following a series of vaccines on February 11, 1981, as well as trauma from a beating in 1982. (Plaintiff's Brief, Ex. 1, Pt. 1 at 1.) Kessler reported that Blevins would have a poor chance of finding, holding and performing steady gainful employment. (Plaintiff's Brief, Ex. 1, Pt. 1 at 2.)

On April 7, 2010, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that

Blevins suffered from a nonsevere affective disorder and personality disorder. (R. at 70-72.) He opined that Blevins had no restrictions on his activities of daily living or in his ability to maintain social functioning. (R. at 71.) He found that Blevins had mild difficulties in maintaining concentration, persistence or pace and that he had not experienced any repeated episodes of decompensation of extended duration. (R. at 71.) Leizer opined that Blevins's allegations were partially credible. (R. at 71.) He noted that the medical evidence and Blevins's residual functional capacity indicated an ability to perform all levels of work. (R. at 71.)

On April 8, 2010, Dr. Richard Surrusco, M.D., a state agency physician, found that Blevins had the residual functional capacity to perform light work. (R. at 72-73.) He found that Blevins could occasionally climb ramps and stairs, crouch and crawl and never climb ladders, ropes or scaffolds. (R. at 72-73.). He imposed no manipulative, visual or communicative limitations on Blevins. (R. at 73.) Dr. Surrusco found that Blevins should avoid concentrated exposure to work hazards. (R. at 73.)

On July 9, 2010, Dr. Bert Spetzler, M.D., a state agency physician, found that Blevins had the residual functional capacity to perform light work. (R. at 82-84.) He found that Blevins could occasionally climb ramps and stairs, crouch and crawl and never climb ladders, ropes or scaffolds. (R. at 83.). He imposed no manipulative, visual or communicative limitations on Blevins. (R. at 83-84.) Dr. Spetzler found that Blevins should avoid concentrated exposure to work hazards. (R. at 84.)

On August 17, 2010, Wade Smith, M.S., a licensed senior psychological examiner, evaluated Blevins at the request of Disability Determination Services. (R. at 453-57.) Blevins reported that he enlisted in the Army and served three years of active duty before being honorably discharged. (R. at 454.) He stated that he was beaten while stationed in Germany as retaliation for reporting one of his sergeants. (R. at 454.) Blevins reported that he was diagnosed as having a concussion after his niece struck him in the head with a gun. (R. at 454.) He reported the occasional perception of hearing a radio playing nearby, which began after his concussion from earlier in the year. (R. at 455.) Smith reported that Blevins's attention was intact and that his concentration and short-term memory appeared slightly limited. (R. at 455.) His recent and remote memories were intact. (R. at 455.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Blevins obtained a full-scale IQ score of 70. (R. at 455.) Blevins did not report a predominantly depressed mood, nor did he appear depressed. (R. at 456.) Blevins reported experiencing nightmares in which he was down on the ground being attacked. (R. at 456.) Smith reported that this may represent a degree of lingering PTSD-like reaction to his being assaulted while in the Army. (R. at 456.) Smith reported that Blevins did not appear to meet the complex criteria for PTSD, but that his occasional problems with his temper could be another element of reaction. (R. at 456.) Smith reported that Blevins demonstrated intact psychiatric independence in his daily activities. (R. at 456.) Smith reported that Blevins presented with a normal level of energy and that his fine- and gross-motor skills were within normal limits. (R. at 457.) Blevins reported that he had good relationships with his brothers, but not with other family members. (R. at 457.) He reported that he had a "few friends," one of whom he characterized as close. (R. at 457.) Blevins stated that he was on "good terms with

his neighbors." (R. at 457.) He stated that while he was working, he typically had good relations with his co-workers, but not with his supervisors. (R. at 457.)

Smith reported that Blevins was moderately limited in his ability to understand and remember general items and concepts, but that he should be able to comprehend and follow both simple and some detailed job instructions. (R. at 457.) Blevins's concentration and persistence appeared adequate to meet the demands of simple and some detailed work-related decisions, but the quality of his decisions could possibly deteriorate over the course of an eight-hour shift due to back and joint pain. (R. at 457.) Blevins had a mildly limited ability to interact with others in an appropriate manner, to adapt to changes in the workplace, to be aware of normal hazards and to take appropriate precaution. (R. at 457.) Smith reported that Blevins's capacity to tolerate normal job stress was moderately impaired. (R. at 457.) Smith reported that Blevins's physical problems may detract from his ability to maintain attendance and meet an employment schedule. (R. at 457.) Smith diagnosed anxiety disorder, not otherwise specified, alcohol dependence, sustained in full remission and borderline intellectual functioning. (R. at 457.) Smith assessed Blevins's then-current GAF score at 55. (R. at 457.)

On September 18, 2010, Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed a PRTF indicating that Blevins suffered from a nonsevere affective disorder and organic mental disorder. (R. at 80-82.) He opined that Blevins had no restrictions on his activities of daily living and moderate difficulties in his ability to maintain social functioning and to maintain concentration, persistence or pace. (R. at 81.) He found that Blevins had not experienced any repeated episodes of decompensation of extended duration. (R. at 81.) Milan

opined that Blevins's allegations were partially credible. (R. at 82.) He noted that Blevins's symptoms of depression were controlled with medication and that he was not being treated for his arthritis and had good strength and motor skills. (R. at 82.)

Milan opined that although Blevins was moderately limited in his ability to understand, remember and carry out detailed instructions, he could understand and remember simple work instructions, locations and procedures. (R. at 84-86.) He found that Blevins was moderately limited in his ability to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and to respond appropriately to changes in the work setting. (R. at 85-86.) Milan opined that, objectively, the evidence showed Blevins to be capable of understanding, remembering and carrying out simple, routine tasks with minimal social demands over a normal workday and workweek. (R. at 86.) He found that Blevins was able to meet the basic mental demands of competitive work on a regular, ongoing basis. (R. at 86.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2013); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2013).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2011); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Blevins argues that substantial evidence does not exist to support the ALJ's finding that he was not disabled. (Plaintiff's Brief at 4-5.) Blevins argues that the ALJ failed to consider the severity of his back pain and PTSD in determining that he had the residual functional capacity to perform a limited range of light work.

(Plaintiff's Brief at 4.) Blevins further argues that the ALJ erred by improperly evaluating his complaints of pain. (Plaintiff's Brief at 4.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Blevins argues that the ALJ failed to consider the severity of his back pain and PTSD in determining that he had the residual functional capacity to perform a limited range of light work. (Plaintiff's Brief at 4.) The ALJ found that Blevins had

the residual functional capacity to perform light work that did not require climbing ladders, ropes or scaffolds and that did not require working around unprotected heights or dangerous equipment or products. (R. at 26.) The ALJ further found that Blevins could occasionally crouch, crawl and climb ramps and stairs and that he had moderate limitations in his abilities to work with supervisors, to accept instructions and criticism, to work with co-workers without distractions or exhibiting behavioral extremes, to work with the public, to maintain attention and concentration for extended periods, to work at a production rate pace, to maintain attendance, to be punctual and take usual breaks, to respond appropriately to work pressures and to understand, remember and carry out detailed and complex instructions. (R. at 26.) Based on my review of the record, I find that substantial evidence exists to support this finding.

The record shows that Blevins was diagnosed with coronary artery disease and underwent a left heart catheterization with placement of a stent in the left descending coronary artery on December 10, 2009. (R. at 255, 265-66, 330.) Post-surgical EKGs on December 10, 2009, and December 11, 2009, were normal. (R. at 343.) It was noted that Blevins's coronary artery disease was stable in January 2010, March 2010, June 2010, July 2011 and August 2011. (R. at 270, 285-86, 371, 473, 491.) In July 2011, Blevins denied any chest pain, shortness of breath or heart palpitations and was doing well and performing his regular activities. (R. at 489.)

In February 2010, Blevins was treated in the emergency room for post concussion syndrome after being repeatedly struck in the head by the butt of a rifle on January 27, 2010. (R. at 276-77, 389-96.) A CT scan of the brain in February

2010 showed no acute cranial abnormality, and chest x-rays were normal. (R. at 277, 343-45, 391.) On March 9, 2010, Blevins's post concussion syndrome had resolved. (R. at 270, 384.) Blevins had intact sensation and normal motor strength in the extremities. (R. at 270.) In April and July 2010, Drs. Surrusco and Spetzler determined that Blevins retained the physical residual functional capacity to perform a limited range of light work. (R. at 72-73, 83-84.)

In May 2011, x-rays of Blevins's lumbosacral spine showed some disc space narrowing, small osteophytes at several levels, a small Schmorl's node at the L1-L2 level and early osteoarthritic changes at the L5-S1 level. (R. at 458.) On July 7, 2011, Blevins reported that he was doing well and that he was back to his regular activities. (R. at 489.) In October 2011, Blevins complained of back pain, stating that he had been sitting at a computer a lot and had changed the brake pads on an automobile. (R. at 529.) He had normal range of motion in all extremities, only some tension and spasm on palpation of the paraspinous region, positive straight leg raising on the right side, a normal, steady gait, normal bilateral reflexes, no sensory deficits and normal motor strength. (R. at 531.) In June and July 2013, Blevins had normal muscle strength, bulk and tone, no gross, sensory or motor deficits were noted, and he had a stable gait. (Plaintiff's Brief, Ex. 2, Pt. 2 at 17; Ex. 3, Pt. 3 at 8.) Although Blevins complained of low back pain on August 6, 2013, he reported at a follow-up visit on August 8, 2013, that he was doing well. (Plaintiff's Brief, Ex. 1, Pt. 1 at 19, 27.)

In June 2010, Blevins's thought process and content were logical, his cognitive functioning and judgment were intact, and his insight was fair. (R. at 373-74.) In August 2010, psychologist Smith reported that Blevins did not report a

predominantly depressed mood, nor did he appear depressed. (R. at 456.) Smith reported that Blevins presented with a normal level of energy and that his fine- and gross-motor skills appeared to be within normal limits. (R. at 457.) Blevins reported that he had good relationships with his brothers, but not with other family members. (R. at 457.) He reported that he had a "few friends," one of whom he characterized as close. (R. at 457.) Blevins stated that he was on "good terms with his neighbors." (R. at 457.) He stated that while he was working, he typically had good relations with his co-workers, but not with his supervisors. (R. at 457.) Smith found that Blevins was moderately limited in his ability to understand and remember general items and concepts, but that he should be able to comprehend and follow both simple and some detailed job instructions. (R. at 457.) Blevins's concentration and persistence appeared adequate to meet the demands of simple and some detailed work-related decisions, but the quality of his decisions could possibly deteriorate over the course of an eight-hour shift due to back and joint pain. (R. at 457.) Blevins had a mildly limited ability to interact with others in an appropriate manner, to adapt to changes in the workplace, to be aware of normal hazards and to take appropriate precaution. (R. at 457.) Smith reported that Blevins's capacity to tolerate normal job stress was moderately impaired. (R. at 457.) Smith diagnosed anxiety disorder, not otherwise specified, alcohol dependence, sustained in full remission and borderline intellectual functioning. (R. at 457.)

In September 2010, Milan determined that Blevins's mental impairments caused no more than moderate limitations in his work-related mental activities. (R. at 84-86.) Milan found that Blevins had the mental residual functional capacity to understand, remember and carry out simple routine tasks with minimal social

demands in a normal workday and workweek and remained able to meet the basic mental demands of competitive work on a regular basis. (R. at 86.) Milan opined that, although Blevins was moderately limited in his ability to understand, remember and carry out detailed instructions, he could understand and remember simple work instructions, locations and procedures. (R. at 85.) He found that Blevins was moderately limited in his ability to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and to respond appropriately to changes in the work setting. (R. at 85-86.)

In February 2011, Blevins's depression showed some improvement, and he was satisfactorily responding to treatment. (R. at 518.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). In June 2013, Blevins's judgment and insight were good, his recent and remote memory was intact, and he had a normal mood and affect. (Plaintiff's Brief, Ex. 3, Pt. 3 at 8.) In September 2011, Blevins's thought process and content were logical, his cognitive functioning and judgment were intact, and his insight was good. (R. at 538.) While Blevins

sporadically complained of anger issues,[12] the record does not show that limitations were placed on Blevins's work-related activities as a result of these complaints. (R. at 380-81, 535; Plaintiff's Brief, Ex. 1 at 17, Pt. 1; Ex. 2, Pt. 2 at 15.) In addition, the record shows that Blevins was able to manage his anger. (R. at 380-81, 535.)

Furthermore, Blevins admitted that he was working part-time as an auto body repairman in April 2011; had worked on a car in July 2011; had changed the brake pads on an automobile in October 2011; cut firewood; mowed the yard; was able to manage a checkbook, pay bills and count change; and used a computer. (R. at 211-12, 453, 465-66, 508, 529.)

Blevins also argues that the ALJ erred by failing to properly consider the effect of his pain on his ability to perform substantial gainful activity. (Plaintiff's Brief at 4.) Again, I disagree. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective

---

[12] The record shows that Blevins complained of anger issues on April 20, 2010; October 1, 2011; July 31, 2013; August 6, 2013; and August 13, 2013. (R. at 380-81, 534-35; Plaintiff's Brief, Ex. 1, Pt. 1 at 17; Ex. 2, Pt. 2 at 15.) On three of these occasions, Blevins reported being angry after his medical records were released to his family members without his permission; rejection of his disability claim; and learning of the Army's investigation of his allegations against his commanding sergeant. (R. at 535, Plaintiff's Brief, Ex. 1, Pt. 1 at 15-16; Ex. 2, Pt. 2 at 3.)

complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers. ...

76 F.3d at 595.

In his decision, the ALJ found Blevins's subjective complaints only partially credible, and he discounted Blevins's allegations of totally disabling mental and physical limitations and pain because they were inconsistent with the medical record and Blevins's activities and capabilities. (R. at 30.) For all of these reasons, I find that substantial evidence supports the ALJ's finding that Blevins does not suffer from disabling pain.

Based on the above-cited evidence, I find that substantial evidence supports the ALJ's residual functional capacity finding as to both Blevins's mental and physical impairments. Therefore, I find that substantial evidence supports the ALJ's finding that Blevins is not disabled and not entitled to SSI benefits.

# PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding as to both Blevins's mental and physical impairments; and

2. Substantial evidence exists in the record to support the ALJ's finding that Blevins was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2013):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of

the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to the plaintiff and to all counsel of record at this time.

DATED:     June 26, 2014.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE